UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

LLOYD HUMPHREY

VERSUS

TIDEWATER GOM, INC., ET AL.

CIVIL ACTION

NO. 20-817-JWD-RLB

RULING ON MOTION FOR PARTIAL SUMMARY JUDGMENT

Before the Court is a *Motion for Partial Summary Judgment* ("*Motion*") brought by plaintiff Lloyd Humphrey ("Plaintiff" or "Humphrey"). (Doc. 33.) It is opposed by defendants Tidewater GOM, Inc. ("Tidewater GOM"), Tidewater Inc. ("Tidewater, Inc."), and Tidewater Marine, LLC ("Tidewater Marine") (collectively, "Tidewater" or "Defendants").[1] (Doc. 40.) Plaintiff filed a reply. (Doc. 42.) The Court has carefully considered the law, facts in the record, and arguments and submissions of the parties and is prepared to rule. For the following reasons, the *Motion* is denied.

I.   BACKGROUND AND CONTENTIONS OF THE PARTIES

On December 20, 2019, Plaintiff Lloyd Humphrey was employed as a cleaning tech for The Modern Group/PMI ("PMI") working aboard the M/V Terrel Tide ("Vessel"), "a vessel owned and/or operated by Tidewater Marine, LLC." (Doc. 40 at 2, citing Doc. 20 at 3, ¶ 2.3; *see also* Doc. 33-1 at 1, citing Doc. 19, ¶ 3.) Plaintiff was part of the PMI tank cleaning crew hired to clean tanks aboard the Vessel. (Doc. 33-1 at 1, citing Doc. 19, ¶ 3.)

---

[1] In Plaintiff's *Second Amended Complaint*, Plaintiff alleges that the M/V Terrell Tide "was owned and/or operated" by all three Defendants. (Doc. 19, ¶¶ 2.1, 2.2, 2.3, and 4.) In its answer, Defendants admit that Tidewater GOM was the owner and Tidewater, LLC was the operator. In its briefing Defendants state that the M/V Terrel Tide, is "owned and/or operated by Tidewater Marine, LLC." (Doc. 40 at 2, citing Doc. 20 at 3, ¶ 2.3.) However, in its argument, Defendants draw no distinction between the three Tidewater entities sued, referring to all three collectively as "Tidewater." (Doc. 40 at 1.) For purposes of this *Motion*, the Court will refer to all three defendants collectively as Tidewater.

1

Plaintiff claims he was injured when "an employee of Tidewater had turned on the wrong valve, causing the water to discharge from [a] hose and strike him in the face five to six times and causing the hose to hit him in the back four to five times." (Plaintiff's Statement of Uncontested Facts ("SUF"), Doc. 33-2 at 2, ¶ 5.)  According to Plaintiff, "[t]he PMI crew had not used the hose in question and [had] nothing to do with the Tidewater hoses on Tidewater vessels." (*Id*. at 2, ¶ 6.) Indeed, at the time of the accident, Plaintiff was on "flush time", i.e., taking a break (*id*. at 1, ¶ 3), while Tidewater engineer James Seiffert was flushing liquid mud from the tanks on the vessel (*id*. at 2, ¶ 8). According to Humphrey, while "the boat is working, we can't touch nothing, or do nothing; they're doing everything[.]" (*Id*. at 1, ¶ 3.)

Plaintiff points the Court to the testimony of vessel captain James Keith Stoute who stated that Tidewater engineer Seiffert "is supposed to ensure that the valve [in question] is kept closed." (Doc. 33-2 at 2, ¶ 10, citing Deposition of Stoute, Doc. 33-4 at 57.)[2] Stoute testified that the valve "should have been closed" and that "[i]t should always remain closed." (*Id*. at 2, ¶ 9, citing Doc. 33-4 at 55.) Humphrey himself testified that, after the accident, he "learned that an employee of Tidewater had turned on the wrong valve" causing the accident. (*Id*. at 2, ¶ 5, citing Doc. 33-3 at 50-52.)

Plaintiff also supports his *Motion* with the testimony of Tidewater's "safety captain," Joe Thomas (Doc. 33-5 at 7, 10-11), who was on the Vessel at the time of the accident making a general safety visit (*id*. at 12-14). According to Plaintiff, Thomas confirmed that the hose in question belonged to Tidewater (Doc. 33-2 at 3, ¶ 17); that it was the responsibility of Tidewater vessel engineers to "clos[e] the valve after transferring potable water" (*id*., ¶ 15); and that it was the responsibility of the Tidewater crew to "secure the hose and to secure the end of the hose with a

---

[2] References are to the deposition page numbers, not the record document page numbers.

cap" (*id.*, ¶ 16). Plaintiff claims that Tidewater's post-accident investigation concluded that "a valve was left open, that the end of the hose was not secured with a cap and that the hose itself was not secured." (*Id.*, ¶ 14.)

Plaintiff concedes he was covered under the Longshore and Harbor Workers Compensation Act ("LHWCA"), 33 U.S.C. § 901, *et seq*. (Doc. 33-1 at 4.) However, he contends that the standard governing Defendants' duty of care is not that imposed on the vessel owner by 33 U.S.C. § 905(b) as interpreted by the Supreme Court in the landmark decision of *Scindia Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981), since *Scindia* only applies if the worker is "*injured during stevedoring operations*." (*Id*. at 5-7, quoting *Blanchard v. Weeks Marine, Inc.*, No. 13-5089, 2014 WL 1414640 (E.D. La. Apr. 11, 2014) (emphasis by Plaintiff).) Because he was on a break at the time of the accident, Plaintiff argues that the general maritime law negligence standard, that of reasonable care toward those lawfully aboard the vessel, applies. (Doc. 33-1 at 8-9.) Under this standard, argues Plaintiff, Defendants are negligent as a matter of law for uncapping and opening the valve of the unsecured water hose or allowing that to happen. (*Id*. at 9-10.)

In the alternative, Plaintiff urges that even if *Scindia* applies, Defendants' negligence arose during, and as a result of, an activity which the vessel owner "actively control[led]", one of the categories of negligence for which a vessel owner can be liable under 905(b) and *Scindia*. (*Id*. at 7-8, 9-10.)

Defendants admit that the Vessel is "owned and/or operated by Tidewater Marine, LLC." (Doc. 40 at 2, citing Doc. 20 at 3, ¶ 2.3.) They admit that "the hose involved in the accident was a Tidewater hose" (Doc. 40-2 at 2, ¶ 17, citing Doc. 33-2 at 3, ¶ 17), and that Vessel captain James Keith Stoute testified that Vessel engineer Seiffert's was "supposed to ensure that the [hose] valve

3

is kept closed" (*id*., ¶ 10). Indeed, Stoute testified that the "valve that [the] hose [was] connected to . . . should have been closed" and that "[i]t should always remain closed." (*Id*., ¶ 9.)

But Defendants strongly dispute that Plaintiff has shown who negligently opened the valve and emphasize that safety captain Thomas's investigation never "determine[d] who left the valve open." (Doc 40 at 3, citing Doc. 40-1, Exhibit 3, Deposition of Thomas, at 21.)[3] Likewise, Stoute was never able to determine who opened the valve. (*Id*. at 4, citing Doc. 40-1, Exhibit 2, Deposition of Stoute, at 56.) According to Defendants, the valve in question was "located on the deck, is not locked, and therefore could have been opened, purposefully or accidentally, by anyone on deck, including one of the many independent contractor tank cleaners like Plaintiff working on the vessel." (*Id*., citing Doc. 40-1, Deposition of Stoute, at 56-57.)

While "Plaintiff also argues that the accident occurred because the end of the hose was not secured with a cap and the hose itself was not secured[,] [t]he precipitating cause of the accident was the open valve. . . .  Even if the vessel's crew failed to cap or secure the hose, the Court must still determine why the valve was open[ed] and/or who opened it and the comparative fault of all parties, making summary judgment inappropriate." (Doc. 40 at 7.)

Defendants insist that Plaintiff's testimony that he was struck 5-6 times in the face by the hose and then 3-4 times in the back is belied by the security camera video which shows he was struck only by water and it "demonstrates that nothing happened to him that would suggest he received any serious injury." (Doc. 40 at 2; *see also* Doc. 40-2 at 1, ¶ 5.)

Defendants dispute Plaintiff's suggestion that general maritime negligence and not 905(b) provide the standard to be applied in measuring Defendants' conduct, arguing "[t]his case is plainly

---

[3] Contrary to this Divisions' Local Rules ("Exhibits to and Exhibit Lists for Pleadings," M.D. La. JWd Div. R.), all of the depositions attached to Defendants' opposition are filed under a single exhibit number, Doc. 40-1. The references here distinguish between the depositions by referring to the opposition exhibit number. Again, page references are to the deposition page numbers, not record document page numbers.

4

governed by" 905(b). (Doc. 40 at 9.) This standard is more difficult to meet, Defendants maintain, because it "assume[s] the longshoreman and his crew are experts, experienced and able to avoid hazards and dangers that are not known or expected by passengers or laymen." (*Id*.) In any event, "questions of negligence in maritime cases are generally questions of fact and summary judgment is rarely appropriate." (*Id*. at 10, citations omitted.)

Where, as here, Plaintiff is relying solely on circumstantial evidence, this "evidence must exclude other reasonable hypotheses with a fair amount of certainty" in order to succeed. (Doc. 40 at 10-11, citing *AEP Elmwood v. Tesoro Marine Services, LLC*, No. 02-3570, 2004 WL 1575545, at *5 (E.D. La. July 13, 2004).) Since Plaintiff has failed to do this, his *Motion* must be denied. (*Id*. at 11.)

In his reply brief, Plaintiff argues that Defendants failed to fully state the applicable burden when relying on circumstantial evidence. Quoting from *AEP Elmwood*, Defendants omitted this important qualification:

> This does not mean, however, that [the circumstantial evidence] must negate all other possible causes. Other possible causes of an accident which are remote, conjectural and speculative . . . as a possible cause in fact may be disregarded.

(Doc. 42 at 2, quoting *AEP Elmwood*, 2004 WL 1575545, at *4 (cleaned up).)

Furthermore, while Defendants suggest that Plaintiff or other members of his crew may have opened the valve in question, Plaintiff argues this is refuted by the direct evidence of his own testimony that "the PMI crew had not used the hose in question and 'have nothing to do with their [Tidewater] hoses on their boat[.]' " (*Id*. at 3, citing Doc. 33-3 at 68.) Furthermore, Tidewater's investigation and root cause analysis failed to mention the fault of PMI or any other third party but instead listed this corrective action, among others: "Safety Stand Down held with Engineers stressing the importance of securing deck valves when not in use." (*Id*., citing Doc. 42-1 at 2.)

5

Plaintiff contends that the failure of Tidewater to have policies and procedures to ensure periodic checking of the valves, hose caps, and the securing of the hoses "is further evidence of negligence which clearly militates in favor of summary judgment." (*Id*. at 4.) Even if Plaintiff cannot prove specifically who opened the valve, the evidence of Tidewater's failure to ensure that these safety measures were in place and followed is uncontradicted and warrants summary judgment. (*Id*. at 5.)

## II.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S. Ct. 1348 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

6

Also important here, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure [(that is, beyond doubt)] all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986); *peradventure*, MERRIAM-WEBSTER'S DICTIONARY (2022), https://www.merriam-webster.com/dictionary/peradventure (last visited July 13, 2022). *See also Universal Sav. Ass'n v. McConnell*, 14 F.3d 52 (5th Cir. 1993) (unreported) ("Where the summary judgment movant bears the burden of proof at trial, the summary judgment evidence must affirmatively establish the movant's entitlement to prevail as a matter of law."). That is,

> In contrast, if the movant bears the burden of proof on a claim at trial, then its burden of production is greater. It must lay out the elements of its claim, citing the facts it believes satisfies those elements, and demonstrating why the record is so one-sided as to rule out the prospect of the nonmovant prevailing. If the movant fails to make that initial showing, the court must deny the motion, even if the opposing party has not introduced contradictory evidence in response.

10A Mary Kay Kane, *Federal Practice and Procedure (Wright & Miller)* § 2727.1 (4th ed. 2022).

### III.   DISCUSSION

#### A. What Duty Did Tidewater Owe to Humphrey?

Plaintiff and Tidewater offer differing views regarding the nature of the duty owed by Tidewater. According to Plaintiff, Tidewater owes the general maritime law duty that any vessel owner owes to those on its vessel who are not members of its crew, i.e., to act with ordinary care under the circumstances. (Doc. 33-1 at 8, citing *Banning v. Dufrene Boats, Inc.*, No. 14-990, 2015 WL 1880060, at *2 (E.D. La. Apr. 23, 2015).)

Tidewater counters that non-crew members on its vessel performing ship maintenance or repair are covered by the LHWCA and Tidewater's duty is therefore dictated by Section 905(b) of the LHWCA, a more restricted standard than ordinary negligence. (Doc. 40 at 9.) Tidewater maintains courts have specifically held that tank cleaners like Plaintiff are covered by the LHWCA and therefore their tort claims against the vessel owner are governed by 905(b). (*Id*., citing *Hill v. Texaco, Inc.*, 674 F.2d 447 (5th Cir. 1982); *Green v. CCS Energy Services, LLC*, No. 08-0792, 2008 WL 5157505 (E.D. La. Dec. 9, 2008) and 2009 WL 981720 (E.D. La. Apr. 9, 2009); and *Everett v. Cove Shipping, Inc.*, 685 F. Supp. 831 (S.D. Ala. 1987).)

Plaintiff is right that the general maritime law, also called federal maritime common law,[4] provides a tort remedy in admiralty cases.

> Absent a relevant statute, the general maritime law, as developed by the judiciary, applies. *United States v. Reliable Transfer Co.,* 421 U.S. 397, 409, 95 S. Ct. 1708, 1714, 44 L. Ed. 2d 251 (1975); *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 160–161, 40 S. Ct. 438, 440, 64 L. Ed. 834 (1920). Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules. See *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630, 79 S. Ct. 406, 409, 3 L. Ed. 2d 550 (1959); *Romero v. International Terminal Operating Co*., 358 U.S. 354, 373–375, 79 S. Ct. 468, 480–481, 3 L. Ed. 2d 368 (1959).

*E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864–65, 106 S. Ct. 2295, 2299, 90 L. Ed. 2d 865 (1986).

---

[4] *See Sangha v. Navig8 Ship Mgmt. Pte. Ltd.*, No. 18-131, 2019 WL 1217327, at *13 (S.D. Ala. Feb. 27, 2019) ("General maritime law is how courts frequently refer to federal maritime common law" (quoting *Morgan v. Almars Outboards, Inc.*, 316 F.Supp.3d 828, 833–34 (D. Del. 2018)), *report and recommendation adopted sub nom. Sangha v. Navig8 Ship Mgmt. Pte Ltd.*, No. 18-131, 2019 WL 1207944 (S.D. Ala. Mar. 14, 2019). *See also* Thomas J. Schoenbaum, *Admiralty and Maritime Law*, § 5.1 (6th ed. 2021) ("What is called the general maritime law is the federal common law of maritime matters. . . . To the extent these matters are not covered by federal legislation, the general maritime law applies. The general maritime law is the product of the maritime jurisprudence of the federal courts. . . . Thus, admiralty belies the principle that there is no federal common law.").

Pursuant to its Article III, Section 2, general maritime law-making powers, the Supreme Court "has developed a body of maritime tort principles. . . . " *E. River S.S. Corp.*, 476 U.S. at 865 (citations omitted). Specifically, general maritime law applies "general principles of negligence law to tort actions." *Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352, 356 (5th Cir. 2016) (cleaned up). See also *In re Signal Int'l, LLC*, 579 F.3d 478, 491 (5th Cir. 2009); *Thibodeaux v. Chevron U.S.A., Inc.*, No. 16-12318, 2017 WL 3521563, at *3 (E.D. La. Aug. 16, 2017).

Under general maritime tort law,

> "[g]eneral principles of negligence law determine whether the defendant was negligent in this maritime tort action." *Bourg v. Hebert Marine, Inc.,* No. 86-2266, 1988 WL 2690, at *3 (E.D. La. Jan. 14, 1988) (citing *Casaceli v. Martech Int'l, Inc.*, 774 F.2d 1322, 1328 (5th Cir. 1985); *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980); *S. C. Loveland, Inc. v. E. W. Towing, Inc.*, 608 F.2d 160, 165 (5th Cir. 1979)); see also *In re Signal Int'l, LLC*, 579 F.3d 478, 491 (5th Cir. 2009). "Negligence is the doing of some act which a reasonably prudent person would not do or the failure to do something which a reasonably prudent person would do under like circumstances." *Bourg*, 1988 WL 2690, at *3 (citing *Tiller v. Atl. Coast Line R. Co*., 318 U.S. 54 (1943)).

*Thibodeaux v. Chevron U.S.A., Inc*., No. 16-12318, 2017 WL 3521563, at *3 (E.D. La. Aug. 16, 2017).

Specifically, as applied to vessel owners and operators,

> "[i]t is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630, 79 S. Ct. 406, 3 L. Ed. 2d 550 (U.S. 1959); see also *Daigle v. Point Landing, Inc*., 616 F.2d 825, 827 (5th Cir. 1980) (a plaintiff in a maritime tort case "is owed a duty of ordinary care").

*Chiasson v. Brand Energy Sols*., *LLC*, 439 F. Supp. 3d 816, 821 (W.D. La. 2020).

9

However, a different standard applies to a longshoreman working on a vessel. Before 1972, a longshoreman injured while loading or unloading a vessel could receive worker's compensation benefits and also sue the vessel owner in tort for both negligence and the unseaworthiness of the vessel. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85 (1946). Among other changes made by the 1972 amendment to the LHWCA, Congress eliminated the longshoreman's unseaworthiness cause of action and "the negligence cause of action was preserved in § 905(b) which provided a *statutory* negligence action against the ship. . . ." *Scindia*, 451 U.S. at 165 (emphasis added). But, as *Scindia* pointed out, the language of 905(b) did not specify the acts or omissions of the vessel that would constitute negligence. *Id*.

In interpreting the scope of the statutory duty owed under 905(b), the Court in *Scindia* found that the duty should be fashioned with the expectation that an "expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property. . . . " *Id*. at 167. Thus, the negligence rule under 905(b), at least in the traditional longshoring setting, was crafted by the Court in what has come to be categorized as follows:

> Under section 905(b) a vessel owner owes three specific legal duties to independent contractors working on the vessel: (1) the turnover duty, (2) the duty to protect against hazards arising in areas or equipment under the vessel's active control, and (3) the duty to intervene when the vessel owner knows of a serious hazard and the stevedore improvidently decides to ignore that risk.

*Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 33 (5th Cir. 1997) (citing, *inter alia*, *Scindia*, 451 U.S. 156); *see also Guidry v. Noble Drilling Servs. Inc.,* No. 16-4135, 2018 WL 1631327, at *3 (E.D. La. Apr. 4, 2018).[5]

---

[5] The "turnover duty" encompasses two separate duties: first, to use ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able perform his duties with reasonable safety and, second, to warn the stevedore of any hidden dangers that could not be discovered with the

Here, Plaintiff concedes that he is covered by the LHWCA but nonetheless argues that, under the specific facts of this case, general maritime law negligence, rather than negligence under 905(b), is the appropriate measure of the nature and scope of Tidewater's duty. (Doc. 33-1 at 5-6.) Thus, argues Plaintiff, the applicable duty owed by Tidewater to Humphrey is one of ordinary care which Tidewater clearly breached.

The basis for Plaintiff's argument is that the restrictions and limitations of 905(b) only apply when the longshoreman is "injured *during stevedoring operations.*" (Doc. 33-1 at 5, quoting *Blanchard*, 2014 WL 1414640, at *2 (emphasis added).) More specifically, Plaintiff argues that in order for 905(b) to apply, he must have been "engaged in work activities" at the time of the accident. Because he was taking a break at the time he was injured and therefore was not "engaged in work activities," (*id*. at 6), Humphrey argues he was not injured *during* stevedoring operations and 905(b) does not apply.

Other than the broad and general language quoted above from *Blanchard*, Plaintiff offers no authority for his novel argument that a person covered under the LHWCA who is taking a temporary break from his work aboard a vessel is no longer "engaged in work activities" so that, during the break, he is removed from coverage under the LHWCA and, specifically, removed from the reach of 905(b). The Court is not persuaded by this argument but even if it was, there are questions of fact which make summary judgment inappropriate under either general maritime law negligence or 905(b) negligence.

---

exercise of reasonable care by the experienced stevedore. Force & Norris, *The Law of Maritime Personal Injuries*, § 8.29, at 8-121–22 (5th ed. 2009). Indeed, according to one noted maritime scholar, these three general duties "may be further divided into six categories": 1) "the turnover duty of safe condition"; 2) "the turnover duty to warn"; 3) "the active involvement/control duty"; 4) "the active operations duty"; 5) "the duty to intervene"; and 6) "the duty to supervise and inspect". Schoenbaum, *supra*, § 7.14.

### B. Are There Genuine Issues of Material Fact as to Whether Tidewater Breached its Duty to Humphrey?

The record supports Plaintiff's alternative contention that, even if 905(b) applies, Tidewater had active control of the water hose involved in the accident. As *Scindia* explained, "the vessel may be liable if it . . . fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter *in areas, or from equipment, under the active control of the vessel* during the stevedoring operation." *Scindia*, 451 U.S. at 167 (emphasis added).

The Fifth Circuit has followed this principle. "[A]lthough a vessel owner no longer retains the primary responsibility for safety in a work area turned over to an independent contractor, no such cession results as relates to areas or *equipment over which the vessel's crew retains operational control.*" *Lebrun v. Baker Hughes Inc.*, No. 15-01828, 2017 WL 5485371, at *6 (W.D. La. Nov. 14, 2017) (quoting *Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34 (5th Cir. 1997) (emphasis added)). As to such equipment, "the shipowner owes a duty to 'exercise due care to avoid exposing longshoremen to harm from hazards they may encounter . . . from [such] equipment.'" *Bourda v. Seacor Marine, Inc.*, No. 00-2459, 2002 WL 10458, at *1 (E.D. La. Jan. 2, 2002) (Engelhardt, J.) (quoting *Pimental v. LTD Canadian Pac. Bul*, 965 F.2d 13, 16 (5th Cir. 1992)).

At the time of the accident, Plaintiff was on "flush time", i.e., taking a break (Doc. 33-2 at 1, ¶ 3), while Tidewater engineer James Seiffert flushed liquid mud from the tanks on the vessel (*id*. at 2, ¶ 8). According to Humphrey, during this time and while "the boat is working, we can't touch nothing, or do nothing; they're doing everything[.]" (*Id*. at 1, ¶ 3.) This evidence is uncontradicted in the record and is in fact conceded by Tidewater. (Doc. 40-2 at 1, ¶ 3.) While Tidewater correctly argues that this does not exclude the possibility that somebody other than a Tidewater employee negligently activated the water hose, it does prove conclusively that

12

Tidewater exercised and maintained active control over the hose in question and therefore, under 905(b), owed a duty to Humphrey to exercise due care to avoid exposing him to hazards associated with that equipment. *Bourda*, 2002 WL 10458, at *1.

Tidewater's active control over the water hose is likewise supported by 1) the testimony of Tidewater's safety captain Thomas that the hose in question was a Tidewater hose (Doc. 33-2 at 3, ¶ 17; Doc. 40-2 at 2, ¶ 17); 2) evidence that it was the responsibility of Tidewater vessel engineers to "clos[e] the valve after transferring potable water" (*id.*, ¶ 15);[6] 3) evidence that it was the responsibility of the Tidewater crew to "secure the hose and to secure the end of the hose with a cap" (*id.*, ¶ 16); 4) the testimony of Captain Stoute that Tidewater's engineer "is supposed to ensure that the valve is kept closed" (Doc. 33-2 at 2, ¶ 10; Doc. 40-2 at 2, ¶ 10);[7] 5) Stoute's testimony that the valve "should have been closed" and that "[i]t should always remain closed" (Doc. 33-2 at 2, ¶ 9; Doc. 40-2 at 2, ¶ 9); and 6) Tidewater's Incident/Injury Report which, under "System Corrective Action," "stress[ed the] importance of securing deck valves when not in use as per Marine Superintendent Derwin Breaux." (Doc. 42-1 at 2.)[8]

It is also clear that whoever opened the valve to the water hose in question should not have done so. As mentioned above, Tidewater concedes, "[t]he captain of the vessel, James Stoute, . . . candidly admitted that 'there was a valve that that hose is connected to that should have been closed . . . [and] should always remain closed.' " (Doc. 40 at 3, quoting Doc. 40-1, Exhibit 2, Deposition of Stoute, at 55.)

---

[6] Tidewater admits this with the qualification that "on the day of the accident . . . there was no evidence the vessel crew transferred potable water." (Doc. 40-2 at 2, ¶ 15.)

[7] Tidewater admits this with the qualification that "[t]his does not exclude the possibility that someone in Plaintiff's work crew or someone else did not unsecure and uncup [sic] the hose (and open the valve) in an effort to use the hose." (Doc. 40-2 at 2, ¶ 16.)

[8] The Court notes that while this arguably subsequent remedial measure may not be used to prove negligence, it may be used for other purposes such as "proving ownership, control, or the feasibility of precautionary measures." Fed. R. Evid. 407.

13

But Tidewater is right that Plaintiff has failed to establish "beyond peradventure" that it was a *Tidewater* employee who negligently activated the water line that injured him. Proving that it was Defendants' conduct which caused his injury is Plaintiff's burden as the mover for summary judgment. *Fontenot*, 780 F.2d at 1194. While Tidewater admits that the PMI tank cleaners were not supposed to "touch nothing, or do nothing" at the time the accident happened, that "does not say or prove that [a PMI employee] in fact did not touch anything." (Doc. 40-2 at 1, ¶ 3.) Because it was never determined who activated the hose, the Court agrees with Tidewater that a reasonable jury could find that the hose valve "could have been opened, purposefully or accidentally by anyone on deck, including one of the many independent contractor tank cleaners like Plaintiff working on the vessel." (Doc. 40 at 4, citing Doc. 40-1, Exhibit 2, Deposition of Stoute, at 56-57.)

Plaintiff testified that following the accident, he was told by an African-American employee of Tidewater that a Tidewater trainee had turned on the wrong valve. (Doc. 33-3 at 51-52.) According to Tidewater, "[t]his testimony is not only clearly hearsay and speculative, but there is also absolutely no other support for Plaintiff's assertions" in any of the record. (Doc. 40 at 2-3.) The Court disagrees that this testimony is speculative, and it is arguably not hearsay. *See* Fed. R. Evid. 801(d)(2)(D). Furthermore, there is support for the proposition that the Court could consider this evidence for summary judgment purposes even if it is hearsay. *See, e.g., Texas Ent. Ass'n, Inc. v Hegar*, No. 17-594, 2019 WL 13036162, at *11 n.12 (W.D. Tex. Feb. 27, 2019), *aff'd*, 10 F.4th 495 (5th Cir. 2021); *In re T.K. Boat Rentals*, LLC, 411 F. Supp. 3d 351, 374 (E.D. La. Aug. 7, 2019). *But cf. Lumar v. Monsanto Co.*, 395 F. Supp. 3d 762, 767-77 (E.D. La. June 13, 2019); *Jones Motor Group, Inc. v. Hotard*, 135 F. Supp. 3d 530, 539-40 (E.D. La. Sept. 28, 2015). On the other hand, a post-accident investigation into the incident failed to reveal the identity and

employer of the individual who turned on the water valve. (Doc. 40-1, Exhibit 2, Deposition of Stoute, at 55-56; Doc. 42-1.)

It is true that when the existing record is viewed through the lens of the "more likely so than not so" standard that will govern at trial (*see*, *e.g.*, Fifth Circuit Pattern Jury Instructions (Civil Cases) § 3.2 (2020)),[9] a strong showing can be made that Tidewater was in operational control of its vessel and its equipment while flushing out the lines and that PMI, on the other hand, had been instructed to cease their activities until that operation was completed. Indeed, even if PMI would have been conducting work at the time, it appears that Tidewater had ownership, control, and responsibility for the hose in question. It also appears that, regardless of who activated the water hose, a strong argument can be made that Tidewater should have taken steps to keep this kind of incident from occurring including by making sure the hose was secured and capped. (*See, e.g.*, Doc. 33-5, Deposition of Thomas, at 22-23.) Indeed, according to the record, that was the specific responsibility of the Tidewater's crew. (Doc. 33-2 at 3, ¶ 16; Doc. 40-2 at 2, ¶ 16.)

But for purposes of this *Motion*, however, the question is whether, drawing all inferences in favor of the non-movant (as the Court must), Plaintiff has proved each element of his case "beyond peradventure." Furthermore, " '[g]enerally, the question of negligence in a maritime case is a question of fact for the' factfinder." *Gusman v. Archer Shipping, Ltd.*, 553 F. Supp. 3d 315, 320 (E.D. La. 2021) (quoting *Randolph v. Laeisz*, 896 F.2d 964, 971 (5th Cir. 1990) (gathering cases and concluding that disputed questions of fact existed as to whether a damaged gangway created an unreasonable risk of harm)). Measured by this standard, the Court finds that that are genuine disputes as to material facts which preclude summary judgment.[10]

---

[9] Although this matter will be tried as a bench trial, the burden of proof is the same.
[10] Tidewater makes much of the apparent discrepancy between Plaintiff's description of the mechanics of his injury and what is shown on security camera video of the incident (e.g., that he was struck by water only and not, as claimed

15

## IV. CONCLUSION

For the foregoing reasons, the *Motion for Partial Summary Judgment* brought by plaintiff Lloyd Humphrey (Doc. 33) is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>July 22, 2022</u>.

_____
**JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

---

by Plaintiff, by water and the hose). (*See, e.g.*, Doc. 40 at 5.) This factual dispute does not concern the issues raised by Plaintiff's *Motion* and therefore is not considered in connection with the *Motion*.